**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LAZY Y RANCH LTD,
            *Plaintiff-Appellee,*

            v.

TRACY BEHRENS; MARILYN
HOWARD; KEITH JOHNSON; JIM
RISCH; LAWRENCE WASDEN;
WINSTON WIGGINS; BEN YSURSA;
DOES 1-20; GEORGE BACON,
            *Defendants-Appellants.*

No. 07-35315

D.C. No.
CV-06-00340-MHW

OPINION

Appeal from the United States District Court
for the District of Idaho
Mikel H. Williams, Magistrate Judge, Presiding

Argued and Submitted
August 7, 2008—Seattle, Washington

Filed September 26, 2008

Before: Harry Pregerson, William C. Canby, Jr., and
Cynthia Holcomb Hall, Circuit Judges.

Opinion by Judge Hall

13783

## COUNSEL

Clay R. Smith, Deputy Attorney General, Boise, Idaho, for the defendants-appellants.

Laurence J. Lucas, Boise, Idaho, for the plaintiff-appellee.

**OPINION**

HALL, Circuit Judge:

## I.  INTRODUCTION

This case arises from Lazy Y Ranch's attempt to lease grazing lands from the State of Idaho. The leases were auctioned by the State and although Lazy Y was the high bidder, the leases ultimately were awarded to other parties. Lazy Y filed a complaint under 42 U.S.C. § 1983, alleging that various state officials violated the Equal Protection Clause when they rejected its bids. In particular, Lazy Y alleged that the officials discriminated against Lazy Y because it (1) has perceived ties to conservationists; and (2) is a Washington corporation that was attempting to enter the Idaho grazing market.

Defendants moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), contending that Lazy Y failed to state an Equal Protection claim and, alternatively, that they were entitled to qualified immunity. Defendants' motion relied on various documents indicating they had articulated a legitimate reason for rejecting Lazy Y's bids — namely, that leasing to Lazy Y would involve increased administrative costs because the lands were unfenced and cattle could wander onto adjoining property. The district court struck most of Defendants' extraneous documents and ultimately denied their motion to dismiss. This interlocutory appeal followed, with Defendants relying on the collateral order doctrine as a basis for appellate jurisdiction.

As we explain below, Lazy Y has properly alleged that Defendants violated its rights under the Equal Protection Clause, and also that they violated clearly established law. We therefore affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Complaint and Unchallenged Extraneous Documents

The following facts come from allegations in Lazy Y's first amended complaint and the few extraneous documents that the district court considered as part of Defendants' motion to dismiss.

#### 1. Overview of Idaho Endowment Lands

The lands Lazy Y tried to lease are known as "endowment lands." Endowment lands are controlled by the Idaho State Board of Land Commissioners, also called the "Land Board." Idaho Const., Art. IX § 7. The Land Board must "carefully preserve[ ]" the endowment lands and manage them "in such manner as will secure the maximum long-term financial return to the institution to which [the land is] granted." *Id.* § 8. The Land Board has designated the lands at issue here to be leased to private entities for the benefit of public schools.

Under state law, leases on public school endowment lands may not exceed 10 years (subject to exceptions not relevant here). Idaho Code § 58-307(1). At the beginning of every calendar year, the Idaho Department of Lands ("IDL") gives public notice of all 10-year leases that are expiring on December 31 of that year and offers new 10-year leases to qualified members of the public. When the IDL receives more than one qualified application for the same lease, the IDL "shall . . . auction off and lease the land to the applicant who will pay the highest premium bid therefore." *Id.* § 58-310(1). The IDL's auction is not necessarily final, however, as the Land Board has the power to overturn it. *See id.* § 58-310(4).

#### 2. Lazy Y's Bids

In response to an IDL notice in early 2005, Lazy Y applied for leases on nine grazing lands. With one exception, the prior

lessees also applied for the new leases, as did some third parties. Given the competing applications, Defendant Tracy Behrens, who was then the IDL Range Program Manager, notified applicants that auctions would be held and that they should submit management proposals addressing various environmental concerns. Lazy Y obtained a "resource assessment" from the IDL to ensure that its proposals were consistent with IDL's concerns, and timely submitted the proposals. The proposals indicated that Lazy Y would improve environmental conditions on the land.

Lazy Y alleges that it first experienced unfair treatment on June 1, 2005, when Behrens told it that its management proposals did not adequately address IDL's concerns and would need to be modified. According to Lazy Y, the IDL had routinely leased endowment land to other parties without requiring more specific grazing management proposals than Lazy Y's. Lazy Y also alleges that the proposals of existing lessees would have led to land damage that IDL sought to avoid and that Lazy Y's proposals addressed. Behrens singled out Lazy Y's proposals, Lazy Y says, because the IDL and Land Board believed that Lazy Y was connected to conservationists who have sought to improve state land management.

After Lazy Y submitted new proposals, the parties further disputed their adequacy, and Behrens at one point suggested that Lazy Y might not be familiar with the applicable procedures because it was "not from Idaho." Lazy Y responded that its president was an Idaho resident and that it was fully licensed to do business in Idaho. Eventually, IDL accepted the proposals as complete.

In August 2005, the IDL scheduled auctions for five of the leases.[1] Lazy Y was the high bidder for all five. According to

_____

[1]No auction was scheduled for one lease because Lazy Y was the only applicant. Two other leases were initially not auctioned because they had "creditable improvements" such as fences or other infrastructure for which the prior lessee could claim a financial interest. The ninth lease was never set for auction despite a competing bidder.

Lazy Y, however, an agent for prior lessees named Wally Butler orchestrated efforts to deprive Lazy Y of the leases by appealing the auctions.[2] The appeals allegedly were on the verge of being denied by IDL staff, but before staff could act, Defendant and IDL Director Winston Wiggins unilaterally invalidated the auctions. Wiggins said he did so because — as a result of an administrative error — IDL staff had inadvertently failed to circulate Lazy Y's management proposals to competing bidders before the auctions. Lazy Y alleges that Wiggins's justification was a pretext, again to cover discrimination based on Lazy Y's perceived connection to conservationists and out of a desire to protect prior lessees from competition.[3]

After a delay of several months, during which the prior lessees continued to use the grazing lands, the Land Board ultimately approved Wiggins's decision to void the auctions. In February 2006, the Land Board scheduled new auctions for the five leases, as well as a sixth for which no auction had previously been conducted because of disputes over improvements on the land. The six auctions were held in June 2006, and Lazy Y was again the high bidder on each one. Lazy Y's winning bids totaled $5,825.

This time, none of the competing bidders appealed the auction results. However, Wiggins put the leases on the Land Board's agenda for August 8, 2006. Six days before the Land Board met, Behrens recommended that it deny Lazy Y's leases because taking them from the prior lessees would pre-

[2]Lazy Y's complaint also included claims against Butler, but the district court dismissed them without prejudice, and those claims are not at issue here.

[3]As evidence of the pretext, Lazy Y alleges that Wiggins voided the auctions without providing any notice to Lazy Y, and also that the circulation requirement does not appear in any statute, rule or regulation. These assertions are contradicted, however, by a June 2005 memo to Lazy Y that included an informal IDL policy established in 2001 that competing applicants would receive each other's management proposals before bidding.

sent a "significant increase in administrative costs." As stated in an IDL staff memo provided on August 2, 2006, the increased costs would result because the lands covered by the leases "constitute only a portion of larger grazing allotments" that were not divided by fences, and the previous lessees — in each case the second highest bidders — had grazing rights on the adjacent land. The memo cited increased costs associated with inspecting the sites to ensure that cattle from adjacent lands would not "drift" onto the unfenced endowment lands. The memo estimated that Lazy Y's plans would entail increased administrative costs of approximately $45,000 over the ten-year terms of the six leases. This purported increase would dwarf the $675 total by which Lazy Y's bids exceeded the bids of the second highest bidders.

The August 2, 2006 memo was the first time the IDL had ever mentioned increased administrative costs associated with new lessees. According to Lazy Y, this justification was pretextual, and suggested that Defendants should never have opened the leases for public bidding since the only parties who could avoid increased management costs were the prior lessees. In attacking the assertion of increased administrative costs, Lazy Y claims:

(1)   Defendants failed to establish their prior administrative costs;

(2)   Defendants failed to establish that additional inspections would really be required;

(3)   Defendants' assertion of increased costs for staff time was belied because they were not planning to hire additional staff;

(4)   The vast majority of endowment lands leased for grazing are isolated parcels within larger grazing allotments, so Defendants' management costs already reflect that fact;

(5)   Other than in connection with past efforts by conservationists to obtain state grazing leases, Defendants have rarely if ever cited similar concerns to deny a state lease;

(6)   The IDL regularly loses money on endowment lands because its administrative costs outstrip the modest revenues from leases;

(7)   The IDL rarely undertakes the supervision necessary to ensure that other grazing lessees comply with management requirements for land preservation;

(8)   Defendants ignored the possibility that the denial of Lazy Y's lease would lead to litigation costs.

Lazy Y also alleges that the "administrative costs" rationale appeared after Behrens, Wiggins, and IDL Assistant Director George Bacon spoke with representatives of the local livestock industry in meetings that excluded Lazy Y.

In response to the eleventh-hour assertion of administrative costs, Lazy Y wrote to Wiggins on August 3, 2006, offering to "provide additional fencing and/or pay for additional administrative costs incurred, up to $30,000 over the course of the new ten-year leases, or such additional amount as may be shown as reasonably necessary." Notwithstanding Lazy Y's additional offer, the Land Board denied Lazy Y all six leases at its August 2006 meeting, and instead awarded them to the second highest bidders. Lazy Y alleges that the Board members — Idaho Governor Jim Risch, Secretary of State Ben Ysursa, Superintendent of Schools Marilyn Howard, Attorney General Lawrence Wasden, and State Controller Keith Johnson — summarily dismissed its offer to cover increased costs, thus evidencing their discriminatory treatment of Lazy Y.

Lazy Y filed its complaint on August 28, 2006, and quickly amended it to include similar allegations concerning denial of a seventh lease in September 2006. The first amended complaint seeks damages and injunctive relief.

**B.  Defendants' Motion to Dismiss and Challenged Extraneous Documents**

Defendants moved to dismiss the first amended complaint under Rule 12(b)(6), arguing that Lazy Y failed to state an Equal Protection claim and that they enjoyed qualified immunity from the claims for damages. In support of the motion, Defendants submitted the June 2005 memo from Behrens to Lazy Y, which included various IDL documents related to grazing plan requirements. Defendants also submitted ten other exhibits: (1) minutes and transcripts of the February 2006, August 2006, and September 2006 Land Board meetings (six total documents); (2) IDL memoranda submitted at each of the three meetings (three total documents); and (3) an August 3, 2006, letter from Lazy Y to Wiggins.

Magistrate Judge Williams, acting as the district court with the consent of the parties, considered (1) the June 2005 memo from Behrens to Lazy Y, (2) the August 2006 IDL memorandum, and (3) the August 2006 letter from Lazy Y to Wiggins. The relevant portions of these documents are referenced above.

On motion by Lazy Y, the district court struck Defendants' other exhibits. The exhibits related to the February 2006 meeting indicate that Wiggins told the Land Board that the IDL's failure to circulate Lazy Y's proposals was an administrative error. They also reflected Board members accepting Wiggins's explanation and agreeing that new auctions were a fair solution.

The stricken August 2006 meeting transcripts reflect Defendant Bacon, then the IDL assistant director, telling the

Land Board that the lands at issue lacked internal fences and would be difficult to graze as separate units. Bacon also told the Land Board that the second highest bidders leased or owned the adjacent properties — arrangements that ostensibly avoided the need for fencing. Superintendent Howard said she believed that Lazy Y's offer of compensation to cover increased administrative costs should not be considered because it was "beyond the . . . expectations at the time of auction." Controller Johnson said he agreed and questioned whether even $30,000 would cover the costs of fencing off the grazing lands. Governor Risch said he agreed with Johnson. The Board voted unanimously to deny the leases.

To the same effect are the stricken materials concerning the September 2006 Land Board meeting, where the Board awarded the seventh lease to the second highest bidder. The IDL recommended rejecting Lazy Y's bid because of increased administrative costs, which it represented were approximately $14,000 over ten years. After counsel for Lazy Y offered to reimburse IDL up to $25,000 or provide appropriate fencing, the Board expressed concern that this would be inadequate, and voted unanimously to grant the leases to the second highest bidders.

Although the district court struck most of Defendants' exhibits, it ruled that even considering all of them, Defendants' motion to dismiss lacked merit. The motion was therefore denied. Defendants timely appealed.

## III.   JURISDICTION

We begin by briefly addressing Lazy Y's suggestion that we lack appellate jurisdiction over this interlocutory appeal. Lazy Y argues that (1) Defendants' attacks on the order denying the motion to dismiss exceed the scope of the "collateral order" doctrine upon which they allege jurisdiction, and (2) the order granting Lazy Y's motion to strike documents is unappealable under any doctrine. We disagree.

**[1]** In general, a party is entitled only to a single appeal, to be "deferred until final judgment has been entered." *See Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994). However, under the collateral order doctrine, a litigant may appeal from a "narrow class of decisions that do not terminate the litigation, but must, in the interest of achieving a healthy legal system, nonetheless be treated as final." *Id.* at 867 (internal quotations and citations omitted). To be appealable under the collateral order doctrine, a district court decision must (1) be "conclusive," (2) "resolve important questions completely separate from the merits," and (3) "render such important questions effectively unreviewable on appeal from final judgment in the underlying action." *Id.*

**[2]** Because qualified immunity is immunity from suit itself and not merely a defense to liability, orders denying qualified immunity may be immediately appealable under the collateral order doctrine, including orders denying a motion to dismiss. *See Mitchell v. Forsyth*, 472 U.S. 511, 526-27 (1985). Such an order is reviewable to the extent that it raises an issue of law. *See id.* at 528; *Batzel v. Smith*, 333 F.3d 1018, 1026 (9th Cir. 2003).

**[3]** Here, contrary to Lazy Y's suggestion, we do not construe Defendants' appeal to depend on "their version of the facts." Rather, Defendants argue that Lazy Y's allegations of pretext and animus are irrelevant under Equal Protection law, because they have articulated legitimate reasons for rejecting Lazy Y's bids. In other words, Defendants argue that their *articulated* purposes end the inquiry and mean that Lazy Y's claims of *actual* improper motives fail to establish an Equal Protection violation. They also argue that Lazy Y brings "class of one" claims that are either incognizable or not clearly established in the context of public contracting. These are contentions of law. *See Armendariz v. Penman*, 75 F.3d 1311, 1316-17 (9th Cir. 1996) (en banc).

**[4]** Moreover, whether Defendants' exhibits should have been considered is essentially a legal question, and the order

granting the motion to strike was simply part of the Rule 12(b)(6) analysis, as the district court resolved that motion solely to establish the record for the motion to dismiss. *See Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir. 1994) (discussing when extraneous documents could be considered on a motion to dismiss), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002). We see no reason to treat the order striking documents as separate from the order denying the motion to dismiss. We conclude that we have jurisdiction to review both orders.

## IV.   STANDARD OF REVIEW

We review de novo the district court's denial of a motion to dismiss on qualified immunity grounds. *Jensen v. City of Oxnard*, 145 F.3d 1078, 1082 (9th Cir. 1998). To survive a motion to dismiss for failure to state a claim, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1974 (2007); *see* Fed. R. Civ. P. 12(b)(6). In general, the inquiry is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). However, we need not accept as true allegations contradicting documents that are referenced in the complaint or that are properly subject to judicial notice. *See id.*; *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 899-900 (9th Cir. 2007).

## V.   ANALYSIS

### A.   The Motion to Strike

Defendants contend the district court abused its discretion in striking their exhibits because the exhibits were either referenced in the complaint, or judicially noticeable. Defendants appear correct, *see United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *Branch*, 14 F.3d at 453-54, particularly

because they do not offer the extraneous documents for their truth, but to show their articulated rationales for denying Lazy Y the leases. However, we need not decide the issue because we conclude, as the district court did, that Defendants' motion to dismiss lacks merit even if each extraneous document is considered.

## B.  The Motion to Dismiss

**[5]** The Supreme Court has recently reiterated the familiar two-part analysis for claims of qualified immunity:

> In resolving questions of qualified immunity, courts are required to resolve a threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry. If, and only if, the court finds a violation of a constitutional right, the next, sequential step is to ask whether the right was clearly established in light of the specific context of the case.

*Scott v. Harris*, 127 S.Ct. 1769, 1774 (2007) (citations, quotation marks, and alteration omitted). We consider each inquiry in turn.

### 1.  Equal Protection Violation

**[6]** "The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam) (citations and quotation marks omitted). In cases like this one involving rational basis review, a state actor's classification comports with the Equal Protection Clause so long as it is "rationally related to a legitimate state interest." *E.g.*,

*Pennell v. City of San Jose*, 485 U.S. 1, 14 (1988). Under this standard, a "State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 446 (1985).

**[7]** "The first step in equal protection analysis is to identify the [defendants'] classification of groups." *Country Classic Dairies, Inc. v. State of Montana, Dep't of Commerce Milk Control Bureau*, 847 F.2d 593, 596 (9th Cir. 1988). "To accomplish this, a plaintiff can show that the law is applied in a discriminatory manner or imposes different burdens on different classes of people." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995). Here, the substance of Lazy Y's complaint is that Defendants made the bidding process more cumbersome and ultimately denied its leases because they discriminated on the basis of whether a bidder was a conservationist (or a perceived conservationist) and new to the Idaho grazing market. Lazy Y also alleges that Defendants discriminated in favor of the prior lessees.

In support of their motion to dismiss, Defendants argue that Lazy Y fails to state an Equal Protection claim because (1) they have offered a legitimate purpose for denying the leases to which their actions rationally relate, and (2) Lazy Y's claims amount to a "class of one" theory that is not cognizable in the context of competitive public contracting. Defendants are incorrect.

### a. Sufficiency of a Proffered Rational Basis, Even if Pretextual

#### (1). Defendants Offer No Reason For Treating Conservationists Differently From Other Bidders

**[8]** The first flaw in Defendants' argument is that they have only put forth a rationale for denying Lazy Y's leases; they have not offered a rational basis for classifying based on

whether a lease applicant is a conservationist, as Lazy Y alleges. As Defendants note, the Supreme Court has often indicated that rational basis review should not inquire into the actual purpose of the challenged classification. *See FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993); *United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980)); *see also Heller v. Doe*, 509 U.S. 312, 321 (1993) (a classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification" (citation and quotation marks omitted)); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 463-64 (1981) (rejecting argument that state had to demonstrate an empirical basis for its classification).**⁴** However, these cases do not require us to accept Defendants' characterization of *what classification they made*. In *Beach Communications*, for example, there was no dispute over what line Congress had drawn: it drew "a distinction between [cable television] facilities that serve separately owned and managed buildings and those that serve one or more buildings under common ownership or management," with only the latter being exempt from regulation. 508 U.S. at 309. The question was whether this distinction survived rational basis review. *See id.* In analyzing whether it did, the Court noted that "because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for *the challenged distinction* actually motivated the legislature." *Id.* at 315 (emphasis added).

**[9]** Here, by contrast, the nature of the classification — i.e., what line Defendants drew — is at the center of the dispute.

---

⁴Lazy Y argues that the Supreme Court cases cited above are distinguishable because they involve legislative rather than executive decision-making. However, the Equal Protection Clause applies equally to executive and legislative action. *See Nordlinger v. Hahn*, 505 U.S. 1, 16 n.8 (1992); *see also Immigration Assistance Project of L.A. County Fed'n of Labor v. INS*, 306 F.3d 842, 872 (9th Cir. 2002) (rejecting argument that distinguished executive action from legislative action).

Lazy Y alleges that Defendants classified on the basis of whether the bidder was associated with conservationists, and pleads numerous facts that, if proven, would tend to establish this theory.[5] Though Defendants assert that they classified only on the basis of the costs associated with prospective lessors' management plans, nothing in the cases they cite requires us to accept their explanation. Similarly, while administrative costs might be a valid reason to deny a bidder a lease, it simply does not offer a basis for treating conservationists differently from other bidders.

The Supreme Court's opinion in *Olech* illustrates this point. In *Olech*, the plaintiff alleged that her town had demanded a 33-foot easement in exchange for access to the water supply, while the easements asked of others were only 15 feet. 528 U.S. at 563. The Court did not ask whether there was a rational basis for the village asking for a 33-foot easement from one of its citizens. *See id.* at 565. Rather, the Court noted the plaintiff's allegations that there was no rational reason why she had to provide a *larger* easement than her neighbors'. The allegation of irrational differential treatment properly stated an Equal Protection claim. *See id.*

**[10]** Similar to *Olech*, the question here is not simply whether administrative costs were a rational reason for denying Lazy Y's bid. In short, Lazy Y's claims suggest that

---

[5]For example, Lazy Y alleges that "[o]ther than in connection with past efforts by conservationists to obtain state grazing leases . . . Defendants have rarely if ever cited [increased administrative costs] to deny other parties a lease." Also pertinent are Lazy Y's claims that Defendants (1) required more specific grazing proposals for Lazy Y than it did for competing bidders; (2) inexplicably failed to circulate Lazy Y's proposals to other bidders in violation of their procedures; (3) regularly loses money on endowment lands because its administrative costs outstrip the modest revenues from leases; (4) failed to notify Lazy Y that the parcels were not manageable units before bidding, contrary to a requirement in its operations manual; and (5) delayed disclosure of the costs concern until just six days before the August 2006 Land Board meeting.

administrative costs only matter in some cases — i.e., when the high bidder is a conservationist. The real question is whether there is a rational basis for this distinction. On this record, there is not.

> *(2).  Supreme Court and Circuit Law Allows Some Inquiry Into the Rationale for the Classification*

**[11]** Moreover, even where the nature of the classification is clear, subsequent case law has not rigidly interpreted the cases Defendants cite. The Supreme Court has cautioned that "even the standard of rationality . . . must find some footing in the realities of the subject addressed by the legislation." *Heller*, 509 U.S. at 321; *accord Immigration Assistance Project*, 306 F.3d at 872 (quoting *Heller*). Consistent with this admonition, our circuit has allowed plaintiffs to rebut the facts underlying defendants' asserted rationale for a classification, to show that the challenged classification could not reasonably be viewed to further the asserted purpose. For example, in *Lockary v. Kayfetz*, homeowners challenged a city's moratorium on new water hookups, which the city claimed was needed due to a water shortage. 917 F.2d 1150, 1155-56 (9th Cir. 1990). Because the plaintiffs introduced evidence that there was no water shortage at all, their Equal Protection claim survived summary judgment even under rational basis review. *Id.* Similarly, in *Parks v. Watson*, a developer claimed a city violated its Equal Protection rights when it required the developer to relinquish a well before it could build. 716 F.2d 646, 654-55 (9th Cir. 1983). The city asserted three reasons for the demand: "(1) [the developer]'s noncompliance with the City's request that it submit conceptual drawings of the [project], (2) a concern over the problem of public access, and (3) a desire to acquire [the developer]'s geothermal wells for the City's proposed geothermal heating district." *Id.* at 654. We found factual disputes as to whether the developer failed to submit drawings and whether there was actually a concern over access, and found that a bare desire to take the developer's wells was not a legitimate interest. *Id.* at 654-55.

**[12]** Additionally, we have stated that "in an equal protection claim based on *selective enforcement* of the law, a plaintiff can show that a defendant's alleged rational basis for his acts is a pretext for an impermissible motive." *Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 993 (9th Cir. 2007) (emphasis added); (citing *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 944 (9th Cir. 2004)).

**[13]** Here, Lazy Y attacks the premise that increased administrative costs could rationally result from its leases. Among other things, Lazy Y claims that the IDL "rarely undertakes the supervision necessary to ensure that other grazing lessees comply with management requirements for land preservation." Read in the light most favorable to Lazy Y, this allegation suggests that Defendants may never have intended to police the grazing lands at all, and therefore would never actually have incurred increased costs if Lazy Y was the lessee.[6] And some of Lazy Y's claims amount to allegations of "selective enforcement," such as the claim that Defendants required more specific grazing proposals from Lazy Y than they did for other parties.

**[14]** In sum, we reject Defendants' contention that their administrative costs rationale necessarily defeats Lazy Y's claim. Lazy Y alleges that administrative costs have been raised only to deny leases to conservationists. It also alleges

---

[6]Lazy Y's other attacks on the administrative costs rationale are less availing. The allegation that no costs would result simply because Defendants had not proposed to hire additional staff ignores the possibility that existing staff would be diverted from other projects and would incur increased travel costs. And it is irrelevant that denying Lazy Y's leases might have led to litigation costs. Moreover, we agree that Lazy Y's offers to cover additional administrative costs do not mean it was irrational to reject its bids. The August 2006 memo estimated increased costs of $45,000 if the leases went to Lazy Y. Lazy Y offered to pay $30,000 and whatever other costs were shown to be "reasonably necessary." Defendants could rationally have wished to avoid debates about what costs were "reasonably necessary."

that Defendants would not actually have incurred additional costs at all, and raised them only out of bias against conservationists and market newcomers. These allegations suffice to state an Equal Protection claim even under rational basis review. *See Lockary*, 917 F.2d at 1155-56.

### b.  Class of One

In addition to relying on their administrative costs rationale, Defendants also argue that Lazy Y has asserted a "class of one" claim, which should be deemed incognizable in the context of competitive bidding for public leases. We disagree with Defendants' characterization of Lazy Y's claims.

**[15]** The "class of one" theory was recognized in *Olech*, and is unusual because the plaintiff in a "class of one" case does not allege that the defendants discriminate against a *group* with whom she shares characteristics, but rather that the defendants simply harbor animus against her *in particular* and therefore treated her arbitrarily. *See N. Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008) ("When an equal protection claim is premised on unique treatment rather than on a classification, the Supreme Court has described it as a 'class of one' claim." (citing *Olech*, 528 U.S. at 564)). Such circumstances state an Equal Protection claim because, if a state actor classifies irrationally, the size of the group affected is constitutionally irrelevant. *Olech*, 528 U.S. at 564.

As Defendants recognize, this court has held that plaintiffs cannot bring "class of one" cases challenging public employment decisions, because: (1) "the government as employer has broader powers than the government as regulator, [so] the scope of judicial review is correspondingly restricted; (2) "the need for judicial review under equal protection 'is especially thin' given the number of other legal protections" for public employees; (3) and applying equal protection "to forbid arbitrary or malicious firings . . . would completely invalidate the

practice of public at-will employment." *Engquist*, 478 F.3d at 994-95. The Supreme Court affirmed this ruling and adopted this rationale. *Engquist v. Or. Dep't of Agriculture*, 128 S.Ct. 2146, 2151-57 (2008). Analogizing the public bidding context to the public employment context addressed in *Engquist*, Defendants ask us to hold that the "class of one" theory does not apply.

**[16]** The problem with this argument, however, is that Lazy Y does not rely on a class of one theory. Lazy Y alleges repeatedly that Defendants treated it differently based on its perceived association with conservationists and because it was a newcomer to Idaho grazing markets. In other words, Lazy Y's claims are not premised on "unique treatment" but on "a classification;" therefore, we need not decide whether the class of one theory would be cognizable in this context. *See N. Pacifica*, 526 F.3d at 486.

Accordingly, Plaintiffs have stated an Equal Protection claim.

### 2. *Clearly Established Right*

**[17]** The second inquiry in a qualified immunity case is whether the constitutional violation the plaintiff has alleged is clearly established. *See Scott*, 127 S.Ct. at 1774. Here, Defendants argue Lazy Y has not alleged such a violation, but they rely on the contention that Lazy Y brings a "class of one" claim. As we explained above, we disagree with this characterization. We view the complaint as relying on the principle that government actors may not draw irrational or arbitrary classifications. This principle is clearly established, *see, e.g.*, *Hydrick v. Hunter*, 500 F.3d 978, 999 (9th Cir. 2007), so Defendants are not entitled to qualified immunity.

## VI. CONCLUSION

The district court's denial of Defendants' Rule 12(b)(6) motion is AFFIRMED and the matter is REMANDED for further proceedings.