**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ROSEMARY D'AUGUSTA; BRENDA DAVIS; PAMELA FAUST; CAROLYN FJORD; DONALD C. FREELAND; DONALD FRYE; GABRIEL GARAVANIAN; VALERIE JOLLY; MICHAEL C. MALANEY; LENARD MARAZZO; LISA MCCARTHY; TIMOTHY NIEBOER; DEBORAH M. PULFER; BILL RUBINSOHN; SONDRA K. RUSSELL; JUNE STANSBURY; CLYDE D. STENSRUD; GARY TALEWSKY; PAMELA S. WARD; CHRISTINE M. WHALEN; MARY KATHERINE ARCELI; JOSE M. BRITO; JAN-MARIE BROWN; JOCELYN GARDNER, | No.23-15878 D.C. No. 4:22-cv-01979-JSW OPINION |

*Plaintiffs-Appellants*,

v.

AMERICAN PETROLEUM INSTITUTE; EXXON MOBIL CORPORATION; CHEVRONTEXACO CAPITAL CORPORATION; PHILLIPS 66 COMPANY; OCCIDENTAL

PETROLEUM CORPORATION;
DEVON ENERGY CORPORATION;
ENERGY TRANSFER LP; HILCORP
ENERGY; CONTINENTAL
RESOURCES, INC.,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of California
Jeffrey S. White, District Judge, Presiding

Argued and Submitted June 14, 2024
San Francisco, California

Filed September 16, 2024

Before:  Ronald M. Gould, Richard C. Tallman, and Ryan
D. Nelson, Circuit Judges.

Opinion by Judge R. Nelson

# SUMMARY[*]

## Antitrust / Political Question / Act of State Doctrine

The panel affirmed the district court's order dismissing an action brought by gasoline consumers alleging an antitrust conspiracy to limit oil production.

Plaintiffs, individual consumers who purchased gasoline from stores owned by defendants, alleged that defendants colluded with the United States government, including then-President Trump, to negotiate with Russia and Saudi Arabia to cut oil production, limit future oil exploration, and end a price war on oil. Plaintiffs alleged that defendants' agreement fixed gas prices in violation of Sherman Act § 1; defendants engaged in a conspiracy to suppress competition in oil production in violation of Sherman Act § 2; and defendants engaged in anticompetitive mergers and acquisitions in violation of Clayton Act § 7.

The panel held that, under both the political question doctrine and the act of state doctrine, the court lacked subject-matter jurisdiction to adjudicate plaintiffs' allegations of a global oil conspiracy involving the United States, Russia, and Saudi Arabia. Under the political question doctrine, President Trump's decision to negotiate with other countries was a fundamental foreign relations decision. Subjecting this decision to judicial review would amount to second-guessing the Executive Branch's foreign policy. In addition, there were no judicially discoverable and manageable standards that the panel could apply. Agreeing

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

with the Fifth Circuit, the panel held that the political question doctrine barred plaintiffs' claims because judicial review would intrude on the prerogatives of the political branches and create an unworkable judicial framework. The panel held that the act of state doctrine also barred plaintiffs' claims because they sought to litigate the petroleum policy of foreign nations.

The panel held that plaintiffs' remaining allegations involving solely private conduct among defendants failed to adequately state a claim. The panel held that plaintiffs failed sufficiently to allege either direct evidence of an antitrust conspiracy or circumstantial evidence of parallel conduct among competitors and certain "plus factors" suggesting a conspiracy.

Finally, the panel held that the district court did not abuse its discretion in procedural orders denying supplemental pleading, additional discovery, and oral argument.

---

## COUNSEL

Joseph M. Alioto, Sr., (argued) and Tatiana V. Wallace, Alioto Law Firm, San Francisco, California; Robert J. Bonsignore, Bonsignore & Brewer, Medford, Massachusetts; Theresa D. Moore, Law Office of Theresa D. Moore PC, San Francisco, California; Christopher A. Nedeau, Nedeau Law Firm, San Francisco, California; Lawrence G. Papale, St. Helena, California; for Plaintiffs-Appellants.

Ginger D. Anders (argued) and Helen E. White, Munger Tolles & Olson LLP, Washington, D.C.; Glenn D. Pomerantz, Munger Tolles & Olson LLP, Los Angeles,

California; Kyle W. Mach, Munger Tolles & Olson LLP, San Francisco, California; Emily J. Henn, Covington & Burling LLP, Palo Alto, California; E. Kate Patchen, Covington & Burling LLP, San Francisco, California; Kyle W. Chow, Covington & Burling LLP, New York, New York; Joshua D. Lichtman, Fulbright & Jaworski LLP, Los Angeles, California; Katherine G. Connolly, Norton Rose Fulbright LLP, San Francisco, California; Dawn Sestito, Stephen McIntyre, and Mark R. Oppenheimer, O'Melveny & Myers LLP, Los Angeles, California; Robert A. Sacks, Diane L. McGimsey, Rose Garber, and Robert M.W. Smith, Sullivan & Cromwell LLP, Los Angeles, California; Stephen Silva, Kirkland & Ellis LLP, San Francisco, California; Daniel E. Laytin,  Tabitha J. DePaulo, and Max Samels, Kirkland & Ellis LLP, Chicago, Illinois; Kyle A. Casazza, Proskauer Rose LLP, Los Angeles, California; Christopher E. Ondeck, Proskauer Rose LLP, Washington, D.C.; Kevin B. Frankel, McGuire Woods LLP, San Francisco, California; Ariel D. House, Baker Botts LLP, Austin, Texas; Isa H. Moya, Danielle C. Morello, and Joseph A. Ostoyich, Clifford Chance US LLP, Washington, D.C; for Defendants-Appellees.

**OPINION**

R. NELSON, Circuit Judge:

Rosemary D'Augusta and other gasoline consumers sued various oil producers for an antitrust conspiracy to limit oil production. Plaintiffs allege that Defendants colluded with the U.S. government, including then-President Trump, to negotiate with Russia and Saudi Arabia to end their price war on oil. These claims are largely barred by the political question and act of state doctrines. Plaintiffs' separate allegations—that Defendants conspired among themselves to raise oil prices—fail to plead an antitrust conspiracy. Thus, we affirm the district court's order dismissing Plaintiffs' claims.

I

A

Plaintiffs are individual consumers who purchased gasoline from stores owned by Defendants. Suing individually, Plaintiffs allege that then-President Trump engineered an antitrust conspiracy among the United States, Saudi Arabia, Russia, and Defendants. This conspiracy entailed cutting oil production, limiting future oil exploration, and terminating the price war between certain oil-producing countries. Doing so would ensure a rise in gas prices and increase Defendants' profits.

Plaintiffs allege that Saudi Arabia and Russia hold extensive control of the global oil and gas market. Saudi Arabia is a member of the Organization of Petroleum Exporting Countries (OPEC), an intergovernmental organization that coordinates member countries' oil production to regulate prices. Russia joined an expansion of

OPEC, along with other oil-producing countries, called OPEC+.  Historically, both Russia and Saudi Arabia produce most of the world's crude oil each year.

From November 2016 to March 2020, Plaintiffs allege that OPEC and Russia agreed to limit the production and sale of oil and gasoline.  Colluding this way would keep prices high to increase profits.  That arrangement, however, allegedly ended in March 2020.  At that time, Plaintiffs suggested that Russia refused to renew its agreement with OPEC, sparking a new price war where both Russia and Saudi Arabia rapidly increased oil production.  By producing oil that far exceeded demand, Plaintiffs believe that these actions caused a precipitous drop in global oil prices.

The Russian-Saudi Arabian price war allegedly shocked Defendants.  They now had to lower oil and gasoline prices to compete.  To prevent further price decreases, Defendants privately agreed among themselves "to take any surplus oil off the market, cut their production, and substantially reduce their investment in exploration and production."  But Defendants' private efforts to collude were in vain.  Prices continued to plummet.  Eventually, Defendants sought an urgent meeting with President Trump, hoping that he could broker an agreement with Saudi Arabia and Russia to stop the price war.  Shortly after this meeting, President Trump allegedly spoke with Russian President Vladimir Putin and the crown prince of Saudi Arabia.  This led to an agreement that if Saudi Arabia and Russia stopped their price war, Defendants would increase their oil and gas prices.

Within a few days, major news organizations began reporting on President Trump's successful efforts to broker an agreement between Saudi Arabia and Russia.  According to Plaintiffs, Saudi Arabia and Russia required the United

States, Canada and Mexico to cut production. And as a positive signal towards that reduction, President Trump tweeted: "There is so much production, no one knows what to do with it." The Secretary of Energy also allegedly bought up excess oil from U.S. producers for the United States' Strategic Petroleum Reserve.

Almost immediately, OPEC held an emergency meeting that resulted in an agreement between Russia and Saudi Arabia to end the price war. The next day, President Putin announced at a G-20 meeting that "his country made a deal with OPEC and the United States," and "a collective cut of 10 million barrels a day" would be necessary to stabilize the markets. Similarly, the Secretary of Energy announced that U.S. oil production would also decrease by nearly 2 million barrels a day.

Thus, Plaintiffs allege, the cartel now included OPEC+ and the Americans. Plaintiffs allege that these agreements caused the price of a barrel of oil to rise from less than $20.00 to over $100.00. In sum, Defendants allegedly used President Trump to cajole foreign powers to cut oil production and raise gas prices.

## B

Plaintiffs plead three claims based on Defendants' alleged antitrust activity. First, they allege that Defendants' agreement fixed gas prices in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Second, Defendants allegedly engaged in a conspiracy to suppress competition in oil production in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. And third, Plaintiffs sought relief for certain Defendants' anticompetitive mergers and acquisitions in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

Plaintiffs sought declaratory relief, damages, disgorgement of profits, and injunctive relief.  They asked the district court to enjoin any future agreements among Defendants, Russia, and Saudi Arabia.  And they requested an order requiring that the largest of Defendants—Exxon, Chevron, and Phillips—"be split up into individual companies as made necessary to restore competition in the oil industry."

The district court granted Defendants' motion to dismiss. *D'Augusta v. Am. Petroleum Inst.*, No. 22-cv-01979-JSW, 2023 WL 137474, at *7 (N.D. Cal. Jan. 9, 2023).  The court first found that it lacked subject-matter jurisdiction as Plaintiffs' claims were barred by the political question, act of state, and *Noerr-Pennington* doctrines. *Id.* at *3–5.  At their core, Plaintiffs' claims dealt with non-justiciable questions over the United States' diplomacy with foreign nations. *Id.*  For the claims related to Defendants' purely private conduct, Plaintiffs failed to adequately plead any agreement that could give rise to antitrust violations. *Id*. at *5.  Separate from any subject-matter issues, the court also granted Defendant Energy Transfer's motion to dismiss for lack of personal jurisdiction. *Id.* at *6.

The district court denied Plaintiffs leave to amend as futile to overcome the jurisdictional bars. *Id.* at *6–7.  For similar reasons, it also denied Plaintiffs leave to reconsider a deposition of Jared Kushner. *Id.* at *7.

## II

On appeal, Plaintiffs missed their initial deadline to file a notice of appeal.  But the district court granted Plaintiffs' motion to extend time to appeal, and Plaintiffs then timely appealed.

The district court had federal-question jurisdiction. 28 U.S.C. § 1331. So we have appellate jurisdiction under 28 U.S.C. § 1291. We review an order granting a motion to dismiss de novo. *Palm v. L.A. Dep't of Water and Power*, 889 F.3d 1081, 1085 (9th Cir. 2018) (citation omitted). When conducting this review, we accept all nonconclusory factual allegations in the complaint as true. *See Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 507–08 (9th Cir. 2013). And we review the district court's denial of leave to amend and denial of discovery for abuse of discretion. *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002); *see also Alaska Cargo Transp., Inc. v. Alaska R.R. Corp.*, 5 F.3d 378, 383 (9th Cir. 1993).

## III

We lack subject-matter jurisdiction to adjudicate Plaintiffs' allegations of a global oil conspiracy involving the United States, Russia, and Saudi Arabia. Both the political question and act of state doctrines present insurmountable bars to Plaintiffs' claims. At bottom, Plaintiffs ask the Judicial Branch to second-guess the foreign policy decisions of the Executive Branch. That would violate well-established limits on our judicial review. Deciding the merits of Plaintiffs' claims would also require us to evaluate the decisions of two foreign countries—Russia and Saudi Arabia. We cannot adjudicate the political decisions of foreign states. As for any allegations about Defendants' private actions, Plaintiffs do not (and cannot)

plausibly allege any type of antitrust conspiracy. Thus, we affirm the district court's order of dismissal.[1]

## A

The political question doctrine is a Founding Era principle that outlines the limits of judicial review of certain presidential actions. *See Marbury v. Madison*, 5 U.S. 137, 170 (1803) ("Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."). This reflects the public understanding at the time that certain functions of government, such as the negotiation of treaties, require the "perfect secrecy" and "immediate despatch" of the Presidency. THE FEDERALIST NO. 64 (John Jay) (cleaned up); *see also* PACIFICUS NO. 1 (Alexander Hamilton) (arguing that the Executive Branch acts as "the *organ* of intercourse between the Nation and foreign [n]ations") (italics in original). The judiciary was ill-suited for "pronouncing upon the [government's] external political relations" as such a task would be "foreign" to it. PACIFICUS NO. 1.

Accordingly, we lack authority to decide a case when it involves a "textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and

---

[1] The district court also held that it lacked personal jurisdiction over Defendant Energy Transfer because it held no ties to California. That was error under our precedent. We have interpreted Section 12 of the Clayton Act (15 U.S.C. § 22) to grant personal jurisdiction over any corporate antitrust defendant with minimum contacts with the nation. *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004). But we affirm the district court's order of dismissal on other grounds and need not reconsider this issue.

manageable standards for resolving it." *Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012) (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993)).[2]  That said, it would be "error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker v. Carr*, 369 U.S. 186, 211 (1962).  Instead, we must "undertake a discriminating case-by-case analysis to determine whether the question posed lies beyond judicial cognizance." *Alperin v. Vatican Bank*, 410 F.3d 532, 545 (9th Cir. 2005).

Still, we have held that the conduct of foreign relations lies almost exclusively with the political branches of government, leaving little for judicial review. *See Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 983–84 (9th Cir. 2007). Thus, an American corporation could not be held liable for the use of its assets because their sale was financed as part of the U.S.' distribution of foreign and military aid.  *Id.* Similarly, an American oil corporation could not be held liable for allegedly funding a foreign military group. *Saldana v. Occidental Petroleum Corp.*, 774 F.3d 544, 552 (9th Cir. 2014).  Because the U.S. also provided military aid to this group, any liability from that funding would intrude on the political branches' exercise of U.S. foreign policy.  *Id.*

---

[2] The Supreme Court also lists other considerations: "[3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker v. Carr*, 369 U.S. 186, 217 (1962).  Here, we decide the case on the first two factors alone.

at 552–53; *see also Def. for Child. Int'l Palestine v. Biden*, 107 F.4th 926, 930 (9th Cir. 2024) (the political question doctrine "reflects the foundational precept, central to our form of government, that federal courts decide only matters of law, with the elected branches setting the policies of our nation").

At bottom, Plaintiffs contend that President Trump improperly negotiated an end to an international oil price war. Yet allegations of a conspiracy between the President, foreign sovereigns, and American corporations raise exactly the non-justiciable issue barred by the political question doctrine. On this point, *Corrie* is helpful. *Corrie* held that granting aid was a "political decision inherently entangled with the conduct of foreign relations." 503 F.3d at 983. And "the conduct of foreign relations is committed by the Constitution to the political departments of the Federal Government." *Id.* (quoting *Mingtai Fire & Marine Ins. v. United Parcel Serv.*, 177 F.3d 1142, 1144 (9th Cir. 1999)).

Here, regardless of any alleged meddling by Defendants, President Trump's decision to negotiate with other countries was a fundamental foreign relations decision. If we subjected it to judicial review, it would amount to second-guessing the Executive Branch's foreign policy. *See id.* at 982. And if the President cannot freely negotiate with foreign powers, then he cannot properly execute the powers given to him by our Constitution. This would undermine the foundational principle of *Marbury*: "[b]y the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion." 5 U.S. at 165–66. Recognizing Plaintiffs' claim would depart from a proper judicial respect for the President's constitutionally delegated authority.

Nor are there any "judicially discoverable and manageable standards" we could apply here. *Zivotofsky*, 566 U.S. at 195. The need to apply these standards "is not completely separate from" the concept of a textual commitment to the coordinate branches. *Nixon*, 506 U.S. at 228. When a statutory scheme can guide us, we can, at times, examine the merits of a case that impacts our country's foreign policy. *See Japan Whaling Ass'n v. Cetacean Soc'y*, 478 U.S. 221, 230 (1986) (judicially manageable standards exist when a "decision . . . calls for applying no more than the traditional rules of statutory construction, and then applying this analysis to the particular set of facts presented below").

Plaintiffs' allegations arise under both the Sherman and Clayton Acts. But our antitrust laws are poorly suited for such a task. The pleadings show that Plaintiffs seek to disrupt the power of OPEC and decouple our country's oil markets from the decisions of foreign nations, some of which have national interests adverse to our own. But these Acts do not provide judicially manageable standards that do not intricately implicate monumental foreign policy questions. By recasting the conduct of foreign relations and national security interests into antitrust terms, we are still being asked to evaluate foreign relations decisions of sovereign nations, including our own. And oil plays a crucial role in our country's economic and national security interests, increasing the complexity of the foreign relations implications. Plaintiffs cite no case to guide us. Nor were our antitrust laws designed to handle such difficult questions on areas of statecraft. *See Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 953 (5th Cir. 2011) (declining to address legal questions "when parties couch the conduct of foreign relations and national security policy in

antitrust terms while essentially asking us to make a pronouncement on the resource-exploitation decisions of foreign sovereigns"). Thus, we do not find any "judicially discoverable and manageable standards" to address these significant foreign relations policies under our antitrust laws.

More than a decade ago, the Fifth Circuit considered a similar question over an alleged antitrust conspiracy between American companies and OPEC to fix oil prices. *Id.* The Fifth Circuit held that adjudicating the case would lead to a "reexamin[ation] [of] critical foreign policy decisions, including the Executive Branch's longstanding approach of managing relations with foreign oil-producing states through diplomacy rather than private litigation." *Id.* at 951. In addition, the court expressed skepticism that antitrust laws could provide "judicially manageable standards" for resolving such a difficult question. *Id.* at 952.

Plaintiffs' claims here are more clearly barred from judicial review than the claims in *Spectrum Stores*. Plaintiffs specifically implicate President Trump's foreign policy decision to negotiate with foreign powers. Such a direct foreign policy question was not at issue in *Spectrum Stores*. The Fifth Circuit relied on the political question doctrine to reject more generalized allegations of collusion between American oil companies and OPEC—with no Presidential or executive action. *Id.* at 944–45.

In sum, the political question bars Plaintiffs' claims because judicial review would intrude on the prerogatives of the political branches and create an unworkable judicial framework.

B

The act of state doctrine also deprives our court of subject matter jurisdiction. Historically, the act of state doctrine is a complement to the political question doctrine. It provides that a federal court "will not adjudicate a politically sensitive dispute which would require the court to judge the legality of the sovereign act of a foreign state." *Int'l Ass'n of Machinists and Aerospace Workers, (IAM) v. Org. of Petroleum Exporting Countries*, 649 F.2d 1354, 1358 (9th Cir. 1981) (citing *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897)). Although this doctrine is not specifically mentioned in the text of the Constitution, its "constitutional underpinnings" derive from the principle of separation of powers. *Id*. at 1359. This doctrine "expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964). And like the political question doctrine, we have few precedents discussing the act of state doctrine.

*IAM* helps our analysis. In *IAM*, a labor union brought antitrust claims against OPEC for raising the cost of petroleum-derived goods. *IAM*, 649 F.2d at 1355. And we applied the act of state doctrine to bar the union's claims. We recognized that "the availability of oil has become a significant factor in international relations." *Id.* at 1360. So the "granting of any relief would in effect amount to an order from a domestic court instructing a foreign sovereign to alter its chosen means of allocating and profiting from its own valuable natural resources." *Id.* at 1361. Furthermore, "adjudication of the legality of the sovereign acts of states . . . risk[s] disruption of our country's international diplomacy,"

intruding again on the prerogative of our political branches. *Id.* at 1358. *IAM* leads us to a single conclusion—we lack jurisdiction under this doctrine also.

Plaintiffs' claims seek to control how sovereign nations—Russia and Saudi Arabia—manage their own petroleum resources. Plaintiffs allege that these countries were indispensable co-conspirators in the scheme to reduce oil production. And these countries allegedly demanded Defendants' cooperation as "quid pro quo" to end the price war. Plaintiffs' claims are thus covered by the act of state doctrine because they seek to litigate the petroleum policy of foreign nations. *See id*. at 1358.

C

Plaintiffs' remaining allegations involve solely private conduct among Defendants. For instance, Plaintiffs allege that "Defendants agreed to take any surplus oil off the market, cut their production, and substantially reduce their investment in exploration and production." While we have jurisdiction to address these allegations of private conduct, Plaintiffs fail to adequately state a claim. *See* FED. R. CIV. P. 12(b)(6). Under Rule 12(b)(6), a court generally "is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff." *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

For a successful antitrust conspiracy claim under either Section 1 or Section 2 of the Sherman Act, a plaintiff must plead "allegations plausibly suggesting (not merely consistent with) agreement," so there is "enough factual matter (taken as true) to suggest that an [unlawful] agreement was made." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007). And to support such a plausible

inference, a plaintiff must plead "who, did what, to whom (or with whom), where, and when." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.6 (9th Cir. 2015) (citation omitted). Such facts may be "direct evidence" of a conspiracy that requires no further inference. *In re Citric Acid Litig.*, 191 F.3d 1090, 1093–94 (9th Cir. 1999). Or such facts may be "circumstantial evidence" in the form of parallel conduct among competitors and certain "plus factors" suggesting a conspiracy. *In re Musical Instruments*, 798 F.3d at 1194 & n.7.[3]

Plaintiffs' bare allegations meet neither requirement for an antitrust conspiracy. As for direct evidence, Plaintiffs allege broadly that Defendants privately "agreed [among themselves] to take any surplus oil off the market, cut their production, and substantially reduce their investment in exploration and production." There is nothing, apart from these conclusory allegations, to plausibly suggest an illegal agreement.

Similarly, Plaintiffs do not plead enough facts to establish "circumstantial evidence" of any parallel conduct. Plaintiffs allege vague statements that "major oil companies" planned to reduce their oil production. Yet Plaintiffs fail to allege which Defendants of these "major oil companies" reduced their production, or when or how they allegedly made these decisions. Nor do Plaintiffs allege the amount of production cut or why these unnamed "major oil companies" did so. Such bare and conclusory allegations do not "plausibly suggest" an antitrust conspiracy.

---

[3] Plaintiffs' opening brief contains no legal discussion of their Clayton Act claim related to Defendants' private conduct. Accordingly, they waived any argument for that claim. *See United States v. Anekwu*, 695 F.3d 967, 985 (9th Cir. 2012).

In addition, allegations of parallel conduct alone are not enough to raise an inference of an agreement when an "obvious alternative explanation" accounts for that same conduct. *Twombly*, 550 U.S. at 567. The "obvious alternative explanation" was the outbreak of the global Covid-19 pandemic. We take judicial notice of this historical event, *Apartment Association of Los Angeles County, Inc. v. City of Los Angeles*, 10 F.4th 905, 910 n.2 (9th Cir. 2021), to acknowledge an alternative explanation. It is not hard to see why Defendants may have chosen to cut oil production beginning in March 2020. The stay-at-home and quarantine orders—both here and across the world—drastically decreased global oil demand. In fact, there was even a brief period when the price for a barrel of oil was negative![4] These circumstances provide a logical explanation for why Defendants would have reduced their oil production. Accordingly, Plaintiffs' "speculative" and "bare assertion[s]" of antitrust conspiracy are nearly identical to cases holding that the claims were implausible. *Twombly*, 550 U.S. at 555–56; *see also In re Musical Instruments*, 798 F.3d at 1194.

## D

Plaintiffs also challenge several of the district court's procedural orders—denial of supplemental pleading, additional discovery, and oral argument. We review these decisions for abuse of discretion. *Zivkovic*, 302 F.3d at 1087. And we affirm.

---

[4] Matt French, *Crude oil prices briefly traded below $0 in spring 2020 but have since been mostly flat*, U.S. ENERGY INFORMATION ADMINISTRATION (Jan. 5, 2021), https://www.eia.gov/todayinenergy/detail.php?id=46336 (https://perma.cc/6M8Z-856N).

Plaintiffs sought leave to amend their complaint to add a corporate defendant while including new representations made by President Trump's Senior Advisor, Jared Kushner. The district court denied leave. *D'Augusta*, 2023 WL 137474, at *6–7.

A court may "permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." FED. R. CIV. P. 15(d). "The clear weight of authority . . . permits the bringing of new claims in a supplemental complaint to promote the economical and speedy disposition of the controversy." *Keith v. Volpe*, 858 F.2d 467, 473 (9th Cir. 1988). That said, denial of leave to amend is proper when any supplemental information "would fail to cure the pleading deficiencies" in the complaint. *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011).

The district court's denial of leave to amend was not an abuse of discretion. Plaintiffs allege that the CEO of Hess Corporation lobbied Mr. Kushner to ask President Trump to resolve ongoing issues with the global oil market. At that point, President Trump allegedly instructed Mr. Kushner to "call the Saudis and the Russians and work with them to make a deal." Plaintiffs believe that these efforts succeeded. They cite Mr. Kushner's memoirs where he claimed to have led "negotiations on the historic OPEC+ oil agreement in April 2020 among the United States, Saudi Arabia and Russia, which led to the largest oil production reductions in history." Even if these negotiations succeeded, however, it would not change our disposition. These allegations

continue to present non-justiciable issues over the Executive Branch's political actions and acts by foreign states.[5]

Nor did the district court err in deciding the motions on the papers. We have repeatedly held that granting a motion without oral argument is not a denial of due process. *See, e.g.*, *Toquero v. I.N.S.*, 956 F.2d 193, 196 n.4 (9th Cir. 1992) ("[I]t is well settled that oral argument is not necessary to satisfy due process.").

IV

In sum, the political question and act of state doctrines deprive us of subject matter jurisdiction over claims related to allegations of governmental collusion, both domestic and foreign. As to private collusion, Plaintiffs have not pled sufficient facts to establish a plausible antitrust conspiracy. And the district court did not abuse its discretion in denying Plaintiffs' various procedural motions.

**AFFIRMED.**

---

[5] For similar reasons, the district court did not abuse its discretion in denying reconsideration of its decision not to allow the deposition of Mr. Kushner. Plaintiffs identify no new information from Mr. Kushner that would change our conclusion that we lack jurisdiction to address Plaintiffs' claims.