**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FLOR MARINA CHAVARRO SALDANA; HECTOR JULIO MARTINEZ CHAVARRO; FLOR AIDE MARTINEZ CHAVARRO; ANA MILENA MARTINEZ CHAVARRO; LUCY ESPERANZA GONZA SANTAFE; PAOLA ANDREA GOYENECH GONZALEZ; EUFROSINA DEL CARMEN GOYE G.; ROSA MARIA RAMIREZ GOMEZ; NELSON PRIETO RAMIREZ; MIREYA PRIETO RAMIREZ; YUDITH PRIETO RAMIREZ; MAXIMINA CHAMUCERO DE PRIETO; BELSY YASMIN SOLANO; JAZMIN ALEJANDRA PRIETO SOLANO; H.N.M.C.; T.K.G.G.; R.A.P.S.; J.E.P.S., *Plaintiffs-Appellants*, <br><br> v. <br><br> OCCIDENTAL PETROLEUM CORPORATION, *Defendant-Appellee*. | No. 12-55484 <br><br> D.C. No. 2:11-cv-08957-PA-AJW <br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted
June 4, 2014—Pasadena, California

Filed December 15, 2014

Before: Alex Kozinski, Stephen S. Trott, and
Consuelo M. Callahan, Circuit Judges.

Per Curiam Opinion;
Concurrence by Judge Trott

## SUMMARY[*]

### Political Question Doctrine

The panel affirmed the district court's dismissal of an action brought under the Alien Tort Statute and California tort law by family members of three union leaders killed in Colombia in August 2004 by members of the Colombian National Army's 18th Brigade.

Plaintiffs contended that Occidental Petroleum Corp. should be held liable for the 18th Brigade's alleged war crimes, crimes against humanity, and assorted torts arising out of the 18th Brigade's murder of the three union leaders. Plaintiffs' theory was that Occidental, via its Colombian subsidiary, provided funding to the 18th Brigade, which gave Occidental operational control over the 18th Brigade,

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

knowing full well that the 18th Brigade was committing murders and other human rights abuses.

The panel affirmed the district court's dismissal of the complaint pursuant to Fed. R. Civ. P. 12(b)(1) on the ground that it raised nonjusticiable political questions. The panel concluded that plaintiffs' claims were inextricably bound to the inherently political question of the propriety of the United States' decision to provide $99 million worth of training to the 18th Brigade at the same time and for the same purpose as Occidental allegedly providing $6.3 million.

Concurring, Judge Trott wrote separately to augment the background material that demonstrated that the complaint raised nonjusticiable political questions, thus depriving the courts of jurisdiction to entertain it.

---

**COUNSEL**

Terrence P. Collingsworth (argued), Conrad & Scherer, LLP, Washington, D.C., for Plaintiffs-Appellants.

Matthew T. Kline (argued) and Dimitri D. Portnoi, O'Melveny & Myers LLP, Los Angeles, California; Jonathan Hacker and Anton Metlitsky, O'Melveny & Myers LLP, Washington, D.C., for Defendant-Appellee.

---

**OPINION**

PER CURIAM:

Family members of three union leaders killed in Colombia in August 2004 by members of the Colombian National Army's ("CNA") 18th Brigade brought this lawsuit in 2011 in Los Angeles, California, against Occidental Petroleum Corporation ("Occidental"), a Delaware corporation with headquarters in Los Angeles. Plaintiffs' complaint contains ten causes of action, three under 28 U.S.C. § 1350, known as the Alien Tort Statute, and the rest under California tort law. As correctly summarized by the district court, Plaintiffs contend that "Occidental should be liable for the 18th Brigade's alleged war crimes, crimes against humanity, and assorted torts arising out of the 18th Brigade's murder of the three union leaders." Plaintiffs' theory is that Occidental provided funding to the 18th Brigade, which gave Occidental operational control over the 18th Brigade, knowing full well that the 18th Brigade was committing murders and other human rights abuses. The district court dismissed the complaint pursuant to Fed. R. Civ. P. 12(b)(1) on the ground that it raised nonjusticiable political questions. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

# I

## A

This case has its genesis in a complex internal armed conflict that Colombia, often with the United States' assistance, has struggled with for decades. Since the 1960s, leftist guerrilla groups such as the Revolutionary Armed

Forces of Colombia (las Fuerzas Armadas Revolucionarias de Colombia, or the "FARC") and National Liberation Army (el Ejército de Liberación Nacional, or the "ELN") have fought to overpower the Colombian government, often resorting to drug trafficking and kidnaping to fund their efforts. The violence in Colombia peaked in the late 1990s, and, in 1997, the U.S. Department of State designated both the FARC and ELN as foreign terrorist organizations. In 2002, Colombian President Álvaro Uribe, with the United States' backing, militarized much of the country in an effort to eradicate the guerrillas. Plaintiffs' claims dissect one small fraction of this conflict.

**B**

Occidental de Colombia, Inc. ("OxyCol"), a Colombian subsidiary of Occidental, and Ecopetrol, Colombia's state-owned oil company, began oil exploration efforts in the Arauca region of northeast Colombia in the 1980s. They discovered one of the largest oil fields in the country, and began extracting oil in 1986. Together, OxyCol and Ecopetrol built the Caño Limón pipeline (the "Pipeline") to transport the oil to the coast. Ecopetrol, OxyCol, and a Spanish company, Repsol, own the oilfield and Pipeline, and OxyCol operates the Pipeline.

The Pipeline begins in the Arauca region near the border with Venezuela and ends at the Carribean port of Coveñas. The first 110 miles of the Pipeline cut through especially volatile guerrilla territory. The guerrillas targeted the Pipeline to sabotage the Colombian economy and protest the exploitation of one of Colombia's most lucrative resources. Plaintiffs allege that OxyCol paid millions of dollars in "war taxes" to the ELN and FARC, starting in the 1980s and

continuing through at least 2000, so that it could operate the Pipeline without interference. After the United States declared the ELN and FARC terrorist organizations in 1997, these payments became illegal.

## C

Guerrilla attacks on the Pipeline continued to increase into the early 2000s, with a high of 170 attacks in 2001. In 2002, because of Colombia's inability to secure the Pipeline on its own and the importance of the Pipeline to United States energy security, the United States created a $99 million aid program to help secure the Pipeline. There can be no doubt that funding, training and equipping the 18th Brigade became an important component of that program. On April 10, 2002, the State Department's Undersecretary for Public Affairs testified before a Subcommittee of the Committee of Appropriations of the House of Representatives in connection with an appropriation of funds for fiscal year 2003. His oral testimony and a written statement included the following:

> Since July of 2000, the United States has provided Colombia with $1.7 billion to combat narcotics trafficking, terrorism, strengthen democratic institutions and human rights, foster socioeconomic development and mitigate the impact of violence on Colombian civilians.
>
> . . . .
>
> We are also helping municipalities increase their ability to manage their policies and their funds. We are working closely with

the prosecutor general's office to set up human rights units throughout the country to facilitate the investigation and prosecution of human rights abuses.

. . . .

Expanding the authorities for the use of aircraft and other assets to cover terrorist and other threats to Colombian democracy will, of course, not ensure that this battle will be won, because they are working against multiple threats. However, we believe that if you approve this proposition, they will give us the flexibility we need to help the government of Colombia more efficiently and more effectively attack the problems that they face.

. . . .

In the longer-term, we are asking for $439 million in . . . funds in our FY-03 budget request to sustain our Plan Colombia programs, as well as $98 million in . . . funds to train and equip Colombian military units protecting the Caño Limón oil pipeline. The $439 million request includes $275 million for the Colombian military and police, and $164 million for democracy programs, alternative development, assistance to vulnerable groups, and promotion of the rule of law. These funds, together with the terrorism supplemental, will be crucial as the next Colombian government works to

improve security, build effective democratic institutions, and foster economic growth.

*Foreign Operations, Export Financing, and Related Programs Appropriations for 2003: Hearing Before the Subcomm. on Foreign Operations, Export Financing, and Related Programs of the Comm. on Appropriations*, 107th Cong. 276–78, 290 (2002).

An assistant secretary of defense for international security affairs then provided the Subcommittee with the Defense Department's perspective on the United States' involvement in Colombia, noting:

> The Administration has proposed to Congress $6 million in FY02 supplemental funding and $98 million in FY03 Foreign Military Finance funding to train and equip vetted Colombian units to protect that country's most threatened piece of critical economic infrastructure – the first 170 kilometers of the Cano-Limon oil pipeline. This segment is the most often attacked. U.S. assistance and training will support two Colombian Army Brigades, National Police and Marines operating in the area. These units through ground and air mobility will be in a better position to prevent and disrupt attacks on the pipeline and defend key facilities and vulnerable points such as pumping stations.

*Id.* at 303–04. In addition, the acting commander in chief of the United States Southern Command provided the

Subcommittee with a written statement on the appropriations, observing:

> In addition to counterdrug assistance, the Administration has proposed to Congress $98 million, for FY 2003, to help Colombia to enhance the training and equipping of units to protect the Caño Limón-Covenas oil pipeline, one of the most vulnerable elements of their economic infrastructure. The FARC and ELN are active in carrying out attacks against Colombia's energy infrastructure. Attacks on the Caño Limón-Covenas pipeline cost the Government of Colombia more that $40 million per month in revenues when the pipeline is not operational.
>
> . . . .
>
> The Administration has included $6 million in the FY 2002 Supplemental to begin training. The first unit to be trained for this program will be the recently human rights vetted, Arauca-based Colombian Army 18th Brigade.

*Id.* at 344–45.

In 2003, the United States and Colombian governments formalized a program and coordinated security strategy in a signed memorandum of agreement. The government-to-government program provided both lethal and non-lethal support to the 18th Brigade, including helicopters, equipment, logistical and infrastructure support, and training. The

Narcotics Affairs Section and Military Group of the U.S. Embassy in Bogotá administered the aid program day-to-day.

To implement the policy of assisting Colombia, Congress appropriated $71 million in 2002 and 2003 to buy helicopters and related support for the 18th Brigade, and $28 million to provide the 18th Brigade with equipment and training by U.S. Special Forces. The training by the U.S. Special Forces began in January 2003, though the helicopters were delayed until 2005. A 2005 letter to Congress from the United States Government Accountability Office ("GAO") reported that:

> U.S. Special Forces provided training and equipment for about 1,600 Colombian Army soldiers to improve their ability to act quickly in minimizing terrorist attacks along the Caño Limón pipeline. In November 2002, a team of U.S. Special Forces traveled to Arauca to assess the area and determine the training needs of the Colombian Army. In January 2003, U.S. Special Forces started training in Arauca and planned for training to continue through December 2004. U.S. Special Forces focused on helping the Colombian Army take a more proactive and aggressive approach to defend the pipeline; regain control of the area around the pipeline; and prevent, interdict, and disrupt the insurgents before they attack the pipeline. Training included developing quick reaction capabilities, small unit tactics, planning and conducting operations, reconnaissance, collecting and analyzing timely intelligence, and medical support.

## D

In May 2004, Ecopetrol and the Colombian Ministry of National Defense entered into an Inter-Institutional Cooperation Agreement (the "Agreement"). Neither Occidental nor OxyCol were signatories to this agreement. In it, Ecopetrol agreed to provide the Ministry with financial support in exchange for the Ministry's increased protection of the Pipeline. Ecopetrol agreed to provide approximately $6.3 million worth of assistance from its joint account with OxyCol. The support Ecopetrol pledged to the Colombian National Army's 18th Brigade explicitly included support in kind for land transportation, air transportation, health services, communications, canine maintenance, and other general and operational expenses. In exchange, the Colombian Ministry of Defense would "provide special attention, based on its own judgment, to the activities aimed at maintaining the conditions of protection and security of Ecopetrol's activities." The Agreement specified that the Ministry would not use any of Ecopetrol's funds for lethal purposes, would respect human rights and international humanitarian laws, could divert its attention elsewhere as needed, and could unilaterally terminate the Agreement for any reason.

The Agreement also created a Supervisory Group and Coordination Committee to implement the Agreement. The Supervisory group, made up of three "superior officers" designated by the Ministry, was charged with overseeing the "correct allocation of the resources" and "implementation of the foreseen security operations, maintenance, and protection plans." The Coordination Committee, consisting of three Ecopetrol representatives (including a representative of OxyCol) and six military representatives, was to "direct the

execution of the Agreement [to achieve] high levels of efficacy and transparency." Specifically, the Coordination Committee would evaluate the Supervisory group, the efficiency and impact of the Agreement on oil operations, and the Agreement's development and necessary corrective measures; keep records related to the execution of the Agreement; ensure that the Agreement would not negatively affect the relationships between the parties and the community; and address unforeseen circumstances that could hinder the execution of the Agreement. Moreover, the Agreement stated that, notwithstanding the powers vested in the Coordination Committee, "the strategic and operational control of the activities carried out by the" Ministry of National Defense and the various branches of the Colombian military "shall be the exclusive responsibility of th[ose] institutions."

## II

## A

In August 2004, after the United States and OxyCol had both begun to provide funding to the CNA, four members of the 18th Brigade assisted by one civilian murdered the three union leaders in Caño Seco, roughly sixty kilometers from the Pipeline. The soldiers, and later high-level officials from the Colombian government, claimed that the leaders were guerrilla members who had attacked the soldiers, and that the soldiers merely returned fire. The union leaders' family members, on the other hand, said that the soldiers executed the leaders after they left one of their homes with their hands in the air.

The union leaders and the social and trade organizations to which they belonged had protested the environmental destruction caused by the Pipeline and OxyCol's plan to drill for oil on or near land belonging to the U'Wa indigenous people. They also criticized the CNA for committing "acts of barbarity" in an effort to protect the Pipeline. According to the complaint, the CNA retaliated against the leaders because of their social activism by conducting illegal searches and detentions of the leaders, their family members, and members of their social and trade organizations.

**B**

The killings spurred various criminal, disciplinary, and administrative proceedings in Colombia. All of the actions that have been formally resolved and are included in the record found that the soldiers wrongly executed the union leaders without any provocation, but did not do so at the direction of the CNA. Plaintiffs imply nevertheless that the soldiers killed the union leaders because the leaders opposed OxyCol's oil exploitation in the region.

**C**

We note that the Colombian proceedings' conclusion that the killings were not instigated by the government was partially corroborated by Special Rapporteur Philip Alston of the United Nations Office of the High Commissioner for Human Rights. In 2010, Mr. Alston reported to the General Assembly on extrajudicial killings of civilians in Columbia. He dismissed the idea that such killings "were committed as part of an official policy or that they were ordered by senior government officials."

**D**

In addition, since 2004, the State Department has issued a series of official certifications to Congress stating "that the Colombian Government and Armed Forces are meeting statutory criteria related to human rights and severing ties to paramalitary groups." These certifications were required by law in order to obligate funds appropriated by Congress to the Colombian Armed Forces. Consolidated Appropriations Act of 2004, Pub. L. No. 108–199, § 563(a)(1), (3), 118 Stat. 3, 193 (2004).

**III**

**A**

Seven years after the killings, Plaintiffs filed suit against Occidental in the Central District of California under the Alien Tort Statute, 28 U.S.C. § 1350, and California state law. Plaintiffs claimed that Occidental, via its Colombian subsidiary, OxyCol, provided purposeful and substantial assistance to the 18th Brigade before and after the killings. They allege that Occidental hired the 18th Brigade as its personal security force, and exercised operational control over the 18th Brigade, all the while knowing that the 18th Brigade would likely commit human rights abuses. Their complaint includes the following allegations:

> 88. Occidental knew or should have known that for years preceding the decedents' murders, there were widespread human rights violations in Arauca committed by the CNA, especially by the 18th Brigade.

89.  The CNA, directly or indirectly (by supporting right-wing paramilitary groups), participated in numerous massacres of civilians and the disappearances, extra-judicial killings, arbitrary detentions, and beatings of social protestors.

. . . .

111.  Given the long and well-publicized history of the CNA's human rights violations (especially those of the 18th Brigade) and Occidental's close relationship with it, Occidental must have known of the CNA's human rights abuses.

. . . .

113.    Despite this human rights "problem," Occidental continued to provide the CNA with financial and other material assistance in order to further Occidental's financial gains from the Colombian operation.

. . . .

172.  When Occidental entered into the renewed . . . Agreement to support the CNA, there was no question that Occidental was providing funding to the CNA to continue its brutal practices and that additional war crimes would be committed by the CNA enabled by Occidental's funding.

173.   Occidental intended that, with its funds, the CNA would expand its war effort against the FARC and ELN and would focus its campaign in the areas of Arauca near the Caño Limón oilfield and Caño Limón-Coveñas pipeline where the FARC and the ELN had attacked so many times before. Given CNA's well publicized record of past war crimes committed in the name of providing security to Occidental, the company certainly had knowledge that the CNA would continue to commit war crimes, including extrajudicial killings of innocent civilians, like Plaintiffs' decedents, who lived in and around the towns Occidental needed the CNA to attack and pacify.

. . . .

212.   The primary war crime that Occidental aided and abetted was the killings of innocent civilians (i.e., Plaintiffs' decedents).  In aiding and abetting these war crimes, Occidental also aided and abetted the killings themselves, which as alleged above, were extrajudicial killings because they were committed by the CNA under color of the authority of the Government of Colombia.

**B**

Relying on *Baker v. Carr*, 369 U.S. 186 (1962), and *Corrie v. Caterpillar, Inc.*, 503 F.3d 974 (9th Cir. 2007), the district court granted Occidental's 12(b)(1) motion to dismiss

on political question grounds, concluding that Plaintiffs "advanced no theory of liability against Occidental that would not apply with equal force to the foreign policy and national security determinations made by the political branches." Because Plaintiffs (1) articulated no additional facts or theories that would avoid the political question, and (2) did not request additional time or the opportunity to conduct discovery on this precise issue, the district court did not give Plaintiffs leave to amend. Plaintiffs appealed and we stayed Plaintiffs' appeal pending the Supreme Court's decision in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013).

## IV

We review a district court's dismissal for lack of jurisdiction de novo, and we may affirm on any basis fairly supported by the record. *Corrie*, 503 F.3d at 979. When determining whether a political question precludes jurisdiction, we may look beyond the complaint to facts properly in the record, *id.* at 982, and "need not presume the truthfulness of the plaintiffs' allegations," *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). Furthermore, "we 'need not . . . accept as true allegations that contradict matters properly subject to judicial notice or by exhibit.'" *Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)); *see also Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) ("[W]e are not required to accept as true conclusory allegations which are contradicted by documents referred to in the

complaint.").[1]    We also need not accept as true legal conclusions contained in the complaint.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## V

## A

"Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803).  This principle is "primarily a function of the separation of powers."  *Baker*, 369 U.S. at 210.   "'The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative [branches] . . . and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision.'"  *Corrie*, 503 F.3d at 982 (quoting *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918)).  But not every case that "touches foreign relations lies beyond judicial cognizance."  *Baker*, 369 U.S. at 211.

In this case, our task is to determine whether Plaintiffs' claims implicate a nonjusticiable political question.  To make this decision, *Baker* requires us to consider whether each claim presents:

> [1] a textually demonstrable constitutional
> commitment of the issue to a coordinate

---

[1] Without objection, the district court took judicial notice of documents referenced in Plaintiffs' complaint.  We granted Occidental's motion to take judicial notice of our government's formal presentations to Congress in support of its request to fund these programs.

political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217. Using these six tests as a guide, "[w]e undertake a discriminating case-by-case analysis," *Corrie*, 503 F.3d at 982 (internal quotation marks omitted), to determine whether a political question is so "inextricabl[y]" tied to the case as to divest the court of jurisdiction. *Baker*, 369 U.S. at 217; *see also Alperin v. Vatican Bank*, 410 F.3d 532, 544 (9th Cir. 2005) ("[T]hese tests are more discrete in theory than in practice, with the analyses often collapsing into one another.").

We conclude that the district court's analysis was correct. Each of Plaintiffs' claims rests on Occidental's partial funding of, and alleged control over, the 18th Brigade. Yet Occidental's "control," when stripped of implausible allegations in the complaint, is premised on nothing more than partial funding. We can therefore see no principled way to sever Occidental's funding from that of the United States. It follows that under the fourth, fifth, and sixth *Baker* tests, Plaintiffs' claims are inextricably bound to an inherently

political question –   the propriety of the United States' decision to provide $99 million worth of training and equipment to the 18th Brigade at the same time and for the same purpose as Occidental allegedly providing $6.3 million – and thus are beyond the jurisdiction of our courts.

## B

Our decision in *Corrie*, in which we dismissed all of the plaintiffs' claims against Caterpillar, Inc. on political question grounds, informs our analysis.  503 F.3d at 977.  The *Corrie* plaintiffs sued Caterpillar after the United States paid for, and Caterpillar supplied, bulldozers to the Israeli Defense Forces ("IDF"), which the IDF used to injure and kill the plaintiffs' family members.  *Id.*  We dismissed the plaintiffs' claims as nonjusticiable because "each claim unavoidably rest[ed] on the singular premise that Caterpillar should not have sold its bulldozers to the IDF."  *Id.* at 982.  Because those "sales were financed by the executive branch pursuant to a congressionally enacted program calling for executive discretion as to what lies in the foreign policy and national security interests of the United States," the action "would necessarily require the judicial branch . . . to question the political branches' decision to grant extensive military aid to Israel."  *Id.*

The same reasoning applies here: each of Plaintiffs' claims unavoidably rests on the premise that Occidental's indirect funding of the 18th Brigade was either knowing or negligent-and-reckless support for a group of guerrillas involved in human rights violations.  However, the United States provided much greater funding to the 18th Brigade at the same time and for the same purpose as Occidental, and thus this case necessarily requires the judicial branch to

question the political branches' decision to provide extensive military aid to Colombia and the CNA. *See id.* Insofar as Occidental was providing funding to the 18th Brigade, it did so "cheek to jowl" with the government of the United States acting in the interests of its national security.

Plaintiffs contend that they need look no further than Occidental itself in order to make their case. However, as we noted in *Corrie*, "resolving their suit will necessarily require us to look beyond the lone defendant in this case and toward the foreign policy interests and judgments of the United States government itself." 503 F.3d at 984. It is true that in *Corrie* we noted the "decisive factor" was that the United States paid for the bulldozers and thus was a "direct actor." *Id.* at 982, 983 n.8. However, as the district court explained, the United States' purchase of the bulldozers was decisive because it evidenced the United States' policy decision to support the IDF's use of the bulldozers. Here too, the United States' provision of $99 million to the CNA – more than 15 times what Occidental contributed (through Oxycol and Ecopetrol) – evidences the United States' support of the 18th Brigade's efforts to secure the Pipeline.

## C

Plaintiffs cite to a handful of military contractor cases that purport to argue in favor of finding no political question here. But those cases at most required the courts to question the on-the-ground execution of military-related operations, not underlying foreign-policy choices such as the very decision to engage in military activity. *See Koohi v. United States*, 976 F.2d 1328, 1331 (9th Cir. 1992) (finding a claim brought by family members of those killed when a United States warship accidentally shot down a civilian airliner justiciable

because "governmental operations are a traditional subject of damages actions"); *Lane v. Halliburton*, 529 F.3d 548, 562 (5th Cir. 2008) (declining to dismiss the case at the motion to dismiss stage because the plaintiffs "presented a plausible set of facts as to the fraud and misrepresentation claims" that could have been tried without implicating a political question); *Bixby v. KBR, Inc.*, 748 F. Supp. 2d 1224, 1239 (D. Or. 2010) (finding the claims against a government contractor who failed to advise the plaintiffs of hazardous chemicals at their work site in Iraq justiciable because "the matter fundamentally at issue [was the] defendants' performance of [their] contractual obligations . . . rather than the advisability of any governmental policy-related decision"). Here, to the contrary, Plaintiffs' claims fundamentally question Occidental's, and thus the United States', very decision to fund the 18th Brigade, rather than Occidental's supervision of the Brigade's on-the-ground operations.

Granted, Plaintiffs' agency theories of liability and negligent hiring claim, which require Plaintiffs to prove Occidental had operational control over the 18th Brigade or those soldiers who committed the killings, *might* sever the political question from this case if plausibly pled. *See generally Lane*, 529 F.3d at 562. But Plaintiffs have failed to plausibly plead those claims, because they have not pleaded "factual content that allows the court to draw the reasonable inference that" Occidental had operational control of the 18th Brigade. *Iqbal*, 556 U.S. at 678.

The May 2004 Inter-Institutional Cooperation Agreement gives complete operational control over the 18th Brigade to the Ministry of Defense. Although the Ministry agreed to give special attention to the Pipeline, it could divert its attention elsewhere as needed and could unilaterally

terminate the Agreement for any reason. Even the Coordination Committee, to which OxyCol could appoint just one of its ten members, was explicitly denied "strategic and operational control" over the CNA.

Much of the information Plaintiffs have put forth to show control despite the explicit terms of the Agreement consists of reports from 1997 and 2001, which are of limited worth. For example, Plaintiffs point to statements made by OxyCol's president regarding the CNA, including that the CNA had the "obligation" to protect the Pipeline and that Occidental "rel[ied] exclusively on the government to provide protection." They also rely on a footnote in the Government Accountability Office report on the United States' aid program, which explained that Occidental's pipeline instrumentation would notify CNA of an attack on the Pipeline, and the CNA would then respond to that attack. But most private enterprises must report attacks or crimes before the government can respond. Plaintiffs also cite the alleged use of an Occidental-provided helicopter to transport the union leaders' bodies after the killings, but reliance and interdependence do not equal control.

Plaintiffs, while recognizing that they will "likely have to show that Occidental had a right to control the 18th Brigade," have failed to allege sufficient facts to suggest that Occidental had any control over the day-to-day operations of the 18th Brigade. Their agency theory of liability and negligent hiring claim could survive only if we implausibly conclude that Occidental somehow exercised more control over the 18th Brigade than the United States did, even though the United States provided much greater funding, provided actual training, and oversaw the execution of the aid program, vetting the 18th Brigade every step of the way. *See Warren*,

328 F.3d at 1139; *cf. Iqbal*, 556 U.S. at 678. On this record, the notion that the CNA ceded control of the 18th Brigade to a Delaware corporation with headquarters in the United States is utterly fanciful. In other words, even accepting Plaintiffs' factual allegations, they fail to support a "reasonable inference" that Occidental through its funding had any control over the operations of the 18th Brigade, or that Occidental's "control," whatever it was, can be distinguished from the United States' "control" over the 18th Brigade.

## D

Finally, Plaintiffs incorrectly assert that the State Department's failure to submit a statement of interest in this case "indicates a lack of conflict." To the contrary, our circuit precedent clearly states that the State Department's silence on this issue is a neutral factor. *Alperin*, 410 F.3d at 556. Moreover, here, the United States' funding, training, and oversight of the 18th Brigade was so obvious as to make a formal statement unnecessary. The facts of this case simply cannot be framed in such a way that severs the tie between the United States' and Occidental's funding of the CNA and the 18th Brigade. *Baker* and *Corrie* require that we leave the issue to the political branches.

## VI

We normally will "not consider an issue not passed upon below," *Dodd v. Hood River Cnty.*, 59 F.3d 852, 863 (9th Cir. 1995) (internal quotation mark omitted), including legal arguments, *see USA Petroleum Co. v. Atl. Richfield Co.*, 13 F.3d 1276, 1283–84 (9th Cir. 1994). Plaintiffs' argument on appeal that the district court should have denied Occidental's motion to dismiss so that they could conduct

discovery on the political question issue falls into that chasm. Plaintiffs did not make that argument below and, thus, have waived it. Neither did they request an opportunity to amend their complaint, choosing instead to appeal.[2]

## VII

Occidental's funding of the 18th Brigade, at the same time and for the same purpose as the United States, is inextricably bound to foreign policy decisions which our Constitution consigns to, and have already been made by, the political branches. "Whether to grant military or other aid to a foreign nation is a political decision inherently entangled with the conduct of foreign relations." *Corrie*, 503 F.3d at 983. Here, Congress and the President determined that economic and military aid and training to Colombia and to the 18th Brigade of the CNA was necessary and appropriate. We cannot adjudicate Plaintiffs' claims without inquiring into or passing judgment on those political decisions. Any verdict or judgment in favor of Plaintiffs would necessarily conflict with and denounce our government's official actions. As we noted in *Corrie*, we "could not find in favor of the plaintiffs without implicitly questioning, and even condemning, United States foreign policy toward [Columbia]." 503 F.3d at 984. Accordingly, Plaintiffs' case directly implicates at least the fourth, fifth, and sixth *Baker* factors: appropriate respect for coordinate branches of government; an unusual need to

---

[2] In their opposition to Occidental's motion to dismiss, Plaintiffs alternatively requested (1) leave to amend their complaint to include additional facts showing that Occidental was the correct defendant, and (2) an opportunity to conduct discovery on the comity issue. But they did not request leave to amend or an opportunity to conduct discovery regarding the political question issue specifically, nor regarding the motion to dismiss generally.

adhere to political decisions made in the context of foreign affairs; and the potential for embarrassment from multifarious pronouncements by various departments on the same question.

If, as Plaintiffs allege in paragraph 88 of their complaint, "Occidental knew or should have known that for years preceding the decedents' murders, there were widespread human rights violations in Arauca committed by the CNA, especially by the 18th Brigade," on this record the same would have to be said of the State Department. Indeed, Plaintiffs' allegations are manifestly irreconcilable with the State Department's human rights certifications to Congress. We remain bound by the Supreme Court's holding in *Oetjen*, 246 U.S. at 302, which we reiterated in *Corrie*, 503 F.3d at 982, that the "conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative [branches] . . . and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." As the political question doctrine bars us from considering the merits of Plaintiffs' claims, the district court's dismissal of their action is **AFFIRMED.**[3]

---

[3] Because of our resolution of this appeal on the basis of political question nonjusticiability, we need not address Occidental's contention that Plaintiffs' case also fails under the Supreme Court's decision in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013).

TROTT, Circuit Judge, concurring:

I agree with my colleagues' resolution of this case and our per curiam opinion. I write separately only to augment the background material that demonstrates that the Plaintiffs' complaint raises nonjusticiable political questions, thus depriving us of jurisdiction to entertain it.

To illustrate the direct foreign policy interests of the United States that envelop every aspect of Plaintiffs' case, I turn to relevant excerpts from the testimony and presentation on April 10, 2002, of Marc Grossman, our State Department's Undersecretary for Public Affairs. He delivered this testimony to a Subcommittee of the Committee of Appropriations of the House of Representatives in connection with an appropriation of funds for fiscal year 2003, requested by President George W. Bush. In Subcommittee Chairman Kolbe's opening statement, he set the stage for the undersecretary's testimony:

> One could have predicted a heated debate last year about our policy in Colombia, but no one could have imagined the developments that have led us to where we are here today. After nearly four years of fruitless and one-sided negotiations, President Pastrana called off the peace process a few weeks ago. I sympathize with the frustration that President Pastrana expressed at that time and the frustration of the Colombian people for this failed attempt to negotiate a settlement to a 40-plus year conflict given the FARC's mockery of the peace negotiations by their continued kidnapping and bombing."

*Foreign Operations, Export Financing, and Related Programs Appropriations for 2003: Hearing Before the Subcomm. on Foreign Operations, Export Financing, and Related Programs of the Comm. on Appropriations*, 107th Cong. 271–272 (2002).

Undersecretary Grossman then explained, in oral testimony and a written statement, our purpose and policy in seeking this appropriation from Congress.

> For me, this comes down to one thing, which is that Colombia matters to the United States. Congress has been a key partner in our efforts to help Colombia defeat the demons that it now confronts in narco-trafficking, underdevelopment, human rights abuses and terrorism. . . .
>
> . . . .
>
> As Chairman Kolbe said, on March the 21st, we came here and proposed, through a supplemental, some changes in law and regulation. We did that because we have come to believe, as Chairman Kolbe said, that the problems of narcotics and terrorism in Colombia are connected. And exactly as the Chairman said, we seek these new authorities because we believe that we can do a better job.
>
> . . . .

*Mr. Chairman, I think it is very important to take an overview here on what we are trying to accomplish in Colombia, which is a hemispheric vision of democracy, prosperity and security.*  I will not go into it in great detail, but you all know that in Quebec last year 34 heads of state and governments of this hemisphere got together and did two very important things.

First of all, they passed a democracy clause which said that all countries in this region to be part of the conversation in the Western Hemisphere ought to be democracies.

Second, they discussed an improved action plan to promote economic prosperity, protect human rights, fight drug trafficking and organized crime.  Additionally, they also set 2005 as a deadline for the Free Trade Area of the Americas.

*Democracy, security and prosperity.  It seems to me that the question we have to ask ourselves is, what good are all these principles if they get trampled in Colombia.*

. . . .

. . . The FARC has killed six Colombian legislators and kidnapped presidential candidate Ingrid Betancourt.  Groups assassinated 12 mayors in 2001, and the

FARC efforts to disrupt the March 10 legislative elections are also well documented.

I also believe that there is an assault on Colombia's prosperity as well. The ELN and FARC bombings of the key Caño Limón oil pipeline cost the government of Colombia almost $500 million in lost revenue last year.

. . . .

. . . I just wanted to say that, we think we have got a hemisphere consensus on security, prosperity and democracy and that these principles really are under attack in Colombia. They are under attack in terms of Colombia's democracy, on security and I would say also – on the Caño Limón pipeline – that there is an assault by the FARC, the ELN and the [United Self-Defense Forces of Colombia ("AUC")] on Colombia's prosperity.

As I was saying, Mr. Chairman, the ELN and FARC bombings of this oil pipeline cost the government of Colombia about $500 million a year, which is equal to about one-third of Bogota's spending on health for its citizens. FARC strikes against the country's power grid in February left 45 towns, including two departmental capitals, without electricity for days. The FARC also attempted twice to blow up dams near Bogota, and had these efforts not been stopped, we

believe they would have killed thousands and thousands of Colombians.

Finally, we have the question of this assault on Colombia's security. The terrorist attacks in Colombia have resulted in over 3,000 Colombians killed in the year 2001. Another 2,856 were kidnapped with ELN, FARC, and AUC responsible for almost 2,000 victims. Again, I show you a chart, over the years, on kidnapping in Colombia.

. . . .

Since July of 2000, the United States has provided Colombia with $1.7 billion to combat narcotics trafficking, terrorism, strengthen democratic institutions and human rights, foster socioeconomic development and mitigate the impact of violence on Colombian civilians.

. . . .

[T]he government of Colombia has extradited 23 Colombian nationals to the United States in 2001; an unprecedented level of cooperation, and I draw your attention to that chart on extraditions. And I believe that the reason we have had this increase in extraditions is the increased engagement we have had with Colombia.

. . . .

We are also helping municipalities increase their ability to manage their policies and their funds.  We are working closely with the prosecutor general's office to set up human rights units throughout the country to facilitate the investigation and prosecution of human rights abuses.  Furthermore, the prosecutor general, as many of you know, was here a couple of weeks ago, and we had a chance to talk to him about the progress we are making in that area as well.

. . . .

As I was reporting to Mrs. Lowey, last week the chief of the Army staff, General Shinseki, and General Speer, went to the highest levels of the military and said that, "Human rights must, must, must be among the most important of your calculations as you move forward."  And I believe, Mr. Chairman, it is right to say that our human rights message is making a real difference.

The Colombian military captured 590 paramilitary members last year and killed 92 members in combat.  Eight military personnel, including two colonels and a lieutenant colonel, were charged in civilian courts with collaborating with paramilitaries or committing gross human rights violations in 2001, and that list goes on.

Still, too many Colombians continue to suffer abuses by state security forces or by terrorist groups acting in collusion with state security units, and those responsible must be punished.

. . . .

Expanding the authorities for the use of aircraft and other assets to cover terrorist and other threats to Colombian democracy will, of course, not ensure that this battle will be won, because they are working against multiple threats. However, we believe that if you approve ths proposition, they will give us the flexibility we need to help the government of Colombia more efficiently and more effectively attack the problems that they face.

. . . .

The FARC and ELN also represent a danger to the $4.3 billion in direct U.S. investments in Colombia. They regularly attack U.S. interests, including the railway used by the Drummond Coal Mining facility and Occidental Petroleum's stake in the Caño Limón Pipeline. Terrorist attacks on the Caño Limón pipeline also pose a threat to U.S. energy security. Colombia supplied 3% of U.S. oil imports in 2001, and possesses substantial potential oil and natural gas reserves.

*. . . .*

*Our request for new authorities does not signify a retreat from our concern about human rights nor signal an ill-guided U.S. commitment in Colombia.  Our proposal expressly states that we will continue to do human rights vetting of all Colombian military units receiving U.S. training or equipment and will maintain the 800 person cap on U.S. military personnel and contractors providing training and other services in Colombia.*

*. . . .*

In the longer-term, we are asking for $439 million in [International Narcotics Control and Law Enforcement ("INCLE")] funds in our FY-03 budget request to sustain our Plan Colombia programs, as well as $98 million in [Foreign Military Financing ("FMF")] funds to train and equip Colombian military units protecting the Caño Limón oil pipeline.  The $439 million request includes $275 million for the Colombian military and police, and $164 million for democracy programs, alternative development, assistance to vulnerable groups, and promotion of the rule of law.  These funds, together with the terrorism supplemental, will be crucial as the next Colombian government works to improve security, build effective democratic institutions, and foster economic growth.

107th Cong. 273–278 (Grossman Testimony), 284–290 (Grossman Statement) (emphasis supplied).

Peter Rodman, assistant secretary of defense for international security affairs, then provided the Subcommittee with the Defense Department's perspective on the United States' involvement in Colombia:

> Continuing to link U.S. Aid to Colombia to a narrow counternarcotics focus means that, by law, we must refrain from providing Colombia certain kinds of military assistance and intelligence support that could immediately strengthen the government's position throughout the country. Hundreds of attacks by the ELN and FARC have been directed at electrical, natural gas and oil infrastructure. As Ambassador Grossman has noted, the guerrillas' sabotage of oil pipelines alone has cost the Government of Colombia lost revenue on the order of $500 million per year. The pipeline was bombed 170 times in 2001, spilling 2.9 million barrels of oil – eleven times the amount of the Exxon *Valdez*.

> The Administration has proposed to Congress $6 million in FY02 supplemental funding and $98 million in FY03 Foreign Military Finance *funding to train and equip vetted Colombian units to protect that country's most threatened piece of critical economic infrastructure – the first 170 kilometers of the Cano-Limon oil pipeline*. This segment is the most often attacked. U.S.

assistance and training will support two Colombian Army Brigades, National Police and Marines operating in the area. These units through ground and air mobility will be in a better position to prevent and disrupt attacks on the pipeline and defend key facilities and vulnerable points such as pumping stations. These units will also send a message that the Colombian State is committed to defending its economic infrastructure – resources that provide sorely needed employment and revenue – from terrorist attacks.

Basic security throughout Colombia's national territory is the essential but missing ingredient. The Pastrana administration's *Plan Colombia* was an admirable start toward resolving Colombia's interrelated problems, of which the security component is only one part. But there can be no rule of law, economic development and new job creation, strengthening of human rights or any other noble goals, where there is no basic security.

Therefore, our policy in Colombia should augment traditional counterdrug programs with programs to help Colombia enhance basic security. A friendly democratic government in our hemisphere is struggling to preserve its sovereign authority under assault from extremists of both left and right. *U.S. policy towards Colombia requires a bipartisan consensus at home for a long-term*

*strategy aimed at strengthening Colombia's ability to enforce effective sovereignty and preserve democracy. The new and more explicitly legal authorities that the Administration is proposing are intended to serve these goals.*

107th Cong. 303–04 (emphasis supplied).

Major General Gary Speer, acting commander in chief of the United States Southern Command, provided the Subcommittee with a written statement on the appropriations, which included the following:

In addition to counterdrug assistance, the Administration has proposed to Congress $98 million, for FY 2003, to help Colombia to enhance the training and equipping of units to protect the Caño Limón-Covenas oil pipeline, one of the most vulnerable elements of their economic infrastructure. The FARC and ELN are active in carrying out attacks against Colombia's energy infrastructure. Attacks on the Caño Limón-Covenas pipeline cost the Government of Colombia more that $40 million per month in revenues when the pipeline is not operational. During the past year, the pipeline was offline for more than 266 days. In addition, the amount of oil spilled during these attacks is eleven times greater than the Exxon Valdez spill, creating significant environmental damages.

*The Administration has included $6 million in the FY 2002 Supplemental to begin training. The first unit to be trained for this program with be the recently human rights vetted, Arauca-based Colombian Army 18th Brigade.* Subsequent units to be trained for infrastructure security include the 5th Mobile Brigade, designated Colombian National Police units, and Colombian Marines. The Colombian units will also be equipped with weapons and ammunition, vehicles, night vision devices, and communications equipment, as well as a helicopter tactical lift capability for a company-sized quick reaction force.

If approved, this training will assist the Colombians to exert effective sovereignty in the Arauca Department, where those attacks primarily occur. Through a comprehensive strategy of reconnaissance and surveillance, offensive and quick reaction operations, the Colombian military will be better able to mitigate the debilitating economic and financial effects of constant attacks on critical infrastructure.

107th Cong. 345 (emphasis supplied).

After this hearing, the Subcommittee submitted a written question to Undersecretary Grossman: "Why would the Administration choose to fund the training of the Colombian military to protect an oil pipeline that is owned in part by

Occidental Petroleum?"    107th Cong 390.    This was Undersecretary Grossman's response:

> The most significant factor in developing the Caño Limón pipeline initiative was the revenues and royalties it generates for Colombia, not its part-ownership by Occidental Petroleum.  *It is in the U.S. national interest to help Colombia's democratic government generate resources to meet pressing social, developmental, and security needs*.  In 2001, the pipeline was attacked 170 times, causing it to be shut down for over 200 days and costing Colombia nearly $500 million in foregone revenues and royalties.

> The proposed training and equipment of Colombian army, police and marine units will also serve as a model for Colombia as it develops additional programs to protect key infrastructure.  Moreover, while Colombia does export some oil to the United States, its potential has not been fully developed, in large part because the security situation discourages investment.  Finally, reducing attacks against the pipeline will lessen the serious environmental damage they cause.

107th Cong. 390–91 (emphasis supplied).

In the United States Senate, before the Committee on Foreign Relations on February 6, 2003, the State Department's witness on our foreign affairs budget for 2004

was Secretary of State Colin L. Powell. Pertaining to the issues in this case, he stated as follows:

> Mr. Chairman, the 2004 budget proposes several initiatives to advance U.S. national security interests and preserve American leadership. The 2004 foreign operations budget that funds programs for the Department of State, USAID, and other agencies is $18.8 billion. Today, our No. 1 priority is to fight and win the global war on terrorism. The budget furthers this goal by providing economic, military, and democracy assistance to key foreign partners and allies, including $4.7 billion to countries that have joined us in the war on terrorism.
>
> . . . .
>
> This budget also includes almost half a billion dollars for Colombia. The funding will support Colombian President Uribe's unified campaign against terrorists and the drug trade that fuels their activities. The aim is to secure democracy, extend security, and restore economic prosperity to Colombia, and prevent the narcoterrorists from spreading instability through the broader Andean region.
>
> . . . .
>
> The President's request for $731 million for the Andean Counterdrug Initiative includes $463 million for Colombia. An

> additional $110 million in military assistance to Colombia will support Colombian President Uribe's unified campaign against terrorists and the drug trade that fuels their activities. *The aim is to secure democracy, extend security, and restore economic prosperity to Colombia, and prevent the narcoterrorists from spreading instability through the broader Andean region.* Critical components of this effort include resumption of the Airbridge Denial program to stop internal and cross-border aerial trafficking in illicit drugs, stepped up eradication and alternative development efforts, and technical assistance to strengthen Colombia's police and judicial institutions.

*Foreign Affairs Budget: Hearing Before the Comm. on Foreign Relations, U.S. Senate*, 108th Cong. 12–13 (Powell Testimony), 19 (Powell Statement) (2003) (emphasis supplied).

To implement our policy of assisting Colombia, Congress appropriated $71 million in 2002 and 2003 to buy helicopters and related support for the 18th Brigade, and $28 million dollars to provide the 18th Brigade with equipment and training by U.S. Special Forces. The training by the U.S. Special Forces began in January 2003, though the helicopters were delayed until 2005. In a report requested by both the House of Representatives and the Senate, the United States Government Accountability Office ("GAO") reported that:

> U.S. Special Forces provided training and equipment for about 1,600 Colombian Army

soldiers to improve their ability to act quickly in minimizing terrorist attacks along the Caño Limón pipeline. In November 2002, a team of U.S. Special Forces traveled to Arauca to assess the area and determine the training needs of the Colombian Army. In January 2003, U.S. Special Forces started training in Arauca and planned for training to continue through December 2004. U.S. Special Forces focused on helping the Colombian Army take a more proactive and aggressive approach to defend the pipeline; regain control of the area around the pipeline; and prevent, interdict, and disrupt the insurgents before they attack the pipeline. Training included developing quick reaction capabilities, small unit tactics, planning and conducting operations, reconnaissance, collecting and analyzing timely intelligence, and medical support.

Of considerable significance in this case is the series of official certifications to Congress by the State Department that it had determined "that the Colombian Government and Armed Forces are meeting statutory criteria related to human rights and severing ties to paramilitary groups." These certifications were required by law in order to obligate funds appropriated by Congress to the Colombian Armed Forces. Consolidated Appropriations Act of 2004, Pub. L. No. 108–199, § 563(a)(1), (3), 118 Stat. 3 (2004).

Secretary of State Powell issued the first of these positive certifications to Congress on September 24, 2004. Secretary of State Condoleezza Rice issued similar positive certifications to Congress in 2005, 2006, and 2007; and the

State Department followed suit from 2008 through 2011, when this case began.  These State Department human rights certifications stand in stark contrast to Plaintiffs' complaint and theory of liability.

As illustrated by this background material, the Supreme Court's authoritative statement in *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918), controls the resolution of this case:

> The conduct of foreign relations of our government is committed by the Constitution to the legislative and legislative [branches] ... and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision.

As my colleagues demonstrate, the Plaintiffs' complaint falls squarely within this prohibition.